Stephen W. Tully, #014076
**TULLY BAILEY LLP**
5230 East Shea Blvd., Suite 230
Scottsdale, AZ 85254
602-805-8960
*stully@tullybailey.com*

Dennis I. Wilenchik, #005350
**WILENCHIK & BARTNESS, P.C.**
2810 North Third Street
Phoenix, AZ 85004
602-606-2810
admin@wb-law.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Wisnowski, Inc., an Arizona corporation, d/b/a Skin Cabaret; Freedom of Expression LLC, an Arizona limited liability company, d/b/a Bones Cabaret; Todd Borowsky, an individual; | Case No.: _____ |
| Plaintiffs, | **VERIFIED COMPLAINT** **(42 U.S.C. 1983)** |
| vs. | |
| City of Scottsdale, an Arizona municipal corporation; Joseph Leduc and Jane Doe Leduc, husband and wife; Jeff Walther and Jane Doe Walther, husband and wife; Bruce Cioli and Jane Doe Cioli, husband and wife; Joel Lewis and Jane Doe Lewis, husband and wife; Dennis Metz and Jane Doe Metz, husband and wife; Aaron Bolin and Jane Doe Bolin, husband and wife; Reed Watson and Jane Doe Watson, husband and wife; | **(Jury Trial Demanded)** |
| Defendants. | |

Docusign Envelope ID: 05B9605A-DA99-4C5E-B7CC-50437664A609

COMES NOW, Plaintiffs, Wisnowski, Inc., d/b/a Skin Cabaret; Freedom of Expression LLC, d/b/a Bones Cabaret; and Todd Borowsky (collectively "Plaintiffs"), for their complaint, against the above-named defendants, allege as follows:

## INTRODUCTION

This civil rights action is brought pursuant to 42 U.S.C. §1983 to stop a longstanding pattern and practice within the Scottsdale Police Department ("SPD") of manipulating official police records, altering investigative reports, omitting exculpatory evidence, and otherwise distorting investigative findings in order to protect favored individuals within law enforcement while targeting disfavored businesses and members of the Scottsdale community.

Plaintiffs allege that this unconstitutional practice is not the result of isolated misconduct by individual officers, but rather reflects a custom, policy, or tacit approval within SPD command leadership, including actions occurring under the authority of senior command staff and the Chief of Police. In one documented incident, SPD's own Internal Affairs division determined that officers altered a sexual-assault report involving another law-enforcement officer after the report was made by an entertainer associated with Skin Cabaret. Internal Affairs confirmed the report had been improperly modified in a manner that shielded the officer from potential criminal exposure, resulting in disciplinary action against those involved.

Despite this finding, SPD personnel continued the same pattern of manipulating reports and investigative narratives when conducting investigations targeting the Skin and Bones Cabarets, including the alteration or omission of material evidence and the presentation of misleading investigative conclusions.

These actions deprived Plaintiffs of rights secured by the United States Constitution, including rights guaranteed by the Fourth and Fourteenth Amendments, and were undertaken pursuant to a continuing municipal custom or practice. This lawsuit seeks to

expose and permanently halt those unconstitutional practices and to hold the responsible officials accountable.

## THE PARTIES

1.     Plaintiff Wisnowski, Inc., d/b/a Skin Cabaret, is an Arizona corporation with its principal place of business located in Maricopa County, Arizona.

2.     Plaintiff Freedom of Expression LLC, d/b/a Bones Cabaret, is an Arizona limited liability company with its principal place of business located in Maricopa County, Arizona.

3.     Plaintiff Todd Borowsky is a resident of Maricopa County, Arizona.

4.     Defendant City of Scottsdale is an Arizona municipal corporation located in Maricopa County, Arizona.

5.     Defendant Joseph LeDuc, is an Arizona resident and is currently the chief of police for the Scottsdale Police Department. He is currently the final policy maker of the department and was responsible for training and supervision of its police officers including Defendants Cioli, Lewis, Metz, Watson and Bolin.

6.     Upon information and belief, Defendant Jane Doe LeDuc, wife of Joseph LeDuc, is an Arizona resident and all acts of the named spouse were performed by and on behalf of their marital community and thus said community is liable for the acts alleged herein.  The true names of the spouse will be added by amendment after learning of them through discovery.

7.     Defendant Jeff Walther is an Arizona resident and the former chief of police for the City of Scottsdale and current assistant city manager. As chief of police he was the final policy maker of the department and was responsible for the training and supervision of its police officers including Defendants LeDuc, Cioli, Lewis, Metz, Watson and Bolin.

8.     Upon information and belief, Defendant Jane Doe Walther, wife of Jeff Walther, is an Arizona resident and all acts of the named spouse were performed by and on behalf of their marital community and thus said community is liable for the acts alleged

3

herein. The true names of the spouse will be added by amendment after learning of them through discovery.

9.    Defendant Bruce Cioli is believed to be an Arizona resident and was a former police commander for the City of Scottsdale Police Department.

10.    Upon information and belief, Defendant Jane Doe Cioli, wife of Bruce Cioli, is an Arizona resident and all acts of the named spouse were performed by and on behalf of their marital community and thus said community is liable for the acts alleged herein. The true names of the spouse will be added by amendment after learning of them through discovery.

11.    Defendant Joel Lewis is an Arizona resident and police sergeant for the Scottsdale Police Department.

12.    Upon information and belief, Defendant Jane Doe Lewis, wife of Joel Lewis, is an Arizona resident and all acts of the named spouse were performed by and on behalf of their marital community and thus said community is liable for the acts alleged herein. The true names of the spouse will be added by amendment after learning of them through discovery.

13.    Defendant Dennis Metz is an Arizona resident and at all times material worked as a Financial Crimes Detective for the Scottsdale Police Department.

14.    Upon information and belief, Defendant Jane Doe Metz, wife of Dennis Metz, is an Arizona resident and all acts of the named spouse were performed by and on behalf of their marital community and thus said community is liable for the acts alleged herein. The true names of the spouse will be added by amendment after learning of them through discovery.

15.    Defendant Reed Watson is an Arizona resident and at all times material worked as a Financial Crimes Detective for the Scottsdale Police Department.

16.    Upon information and belief, Defendant Jane Doe Watson, wife of Reed Watson, is an Arizona resident and all acts of the named spouse were performed by and on

4

behalf of their marital community and thus said community is liable for the acts alleged herein. The true names of the spouse will be added by amendment after learning of them through discovery.

17.    Defendant Aaron Bolin is an Arizona Resident and at all times material was the Public Affairs Officer for the Scottsdale Police Department.

18.    Upon information and belief, Defendant Jane Doe Bolin, wife of Aaron Bolin, is an Arizona resident and all acts of the named spouse were performed by and on behalf of their marital community and thus said community is liable for the acts alleged herein. The true names of the spouse will be added by amendment after learning of them through discovery.

## JURISDICTION AND VENUE

19.    The events giving rise to this action all occurred in Maricopa County Arizona.

20.    The claims asserted herein arise under 42 U.S.C § 1983. This presents a federal question and as such federal jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1343.

21.    The Court has jurisdiction over all the parties, and all the acts took place in Maricopa County, Arizona and therefore venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

22.    Todd Borowsky is the owner of Wisnowski, Inc., an Arizona corporation. Wisnowski, Inc. owns the Skin adult cabaret in Scottsdale, Arizona. Mr. Borowsky purchased Wisnowski, Inc. in 2002.

23.    Mr. Borowsky also owns and is the manager of Freedom of Expression, LLC. Freedom of Expression, LLC purchased the Bones Adult Cabaret, also located in Scottsdale Arizona, in 2016.

5

24. During Mr. Borowsky's ownership, the clubs have been good citizens. In over 20 years in the business, Plaintiffs Skin and Bones Cabarets have not been cited for alcohol or drug infractions. No arrests for criminal acts, such as drug sales or prostitution, have occurred in the clubs.

25. Defendant City of Scottsdale is an Arizona municipal corporation that at all relevant times controlled and was responsible for the Scottsdale Police Department (SPD) and its policymakers, including its Chiefs of Police and command staff. Scottsdale and SPD maintained policies and procedures that facilitated the acts complained of herein and promoted those acts by not adopting policies and procedures to stop the wrongful acts despite having knowledge of them.

26. The Origin of The Dispute

27. In response to the COVID-19 virus, on July 27, 2020, Arizona Governor Ducey issued executive order 2020-43, limiting certain business activities. That order specifically exempted protected speech activities. It stated: "Nothing in this order shall inhibit a person from engaging in constitutionally protected activities such as speech and religion, … provided that such is conducted in a manner that provides appropriate physical distancing to the extent feasible."

28. Adult cabarets are considered a protected speech use. Therefore, Skin and Bones could remain open provided the employees observed appropriate distancing.

29. On Oct. 25, 2020, the Arizona Department of Liquor Licenses and Control (DLLC) determined it desirable to conduct an undercover investigation at Skin Cabaret to determine if the dancers were violating the state's COVID distancing restrictions.

30. At that time, former Scottsdale Police Department (SPD) officer John Cocca was the Director of the DLLC.

31. DLLC Deputy Director Michael Rosenberger, a 27-year veteran of the Scottsdale Police Department, was in charge of the undercover operation and assigned Detective Sanchez to act as the undercover investigator.

32. Sanchez was an odd choice as he had previously sexually touched an entertainer during the same type of undercover DLLC operation. In that investigation, Sanchez admitted to digitally penetrating an entertainer at the Hi-Liter show club in Phoenix.

33. Notwithstanding that background, Director John Cocca and Deputy Director Rosenberger sent Sanchez into the Skin Cabaret. Mr. Sanchez came to the club and after allegedly observing violations of the Covid Restrictions in the main room, requested a private dance with one of the dancers.

34. During that dance, Detective Sanchez became handsy and touched the dancer's buttocks and breasts, grabbed her hips, and started thrusting against her and otherwise acting inappropriately.

35. Detective Sanchez returned later that evening and left a Suspension Order at the club; the order recorded that the entertainer "allowed" Sanchez to touch her breasts and buttocks, suggesting she allowed Sanchez to sexually assault her.

36. The dancer who Sanchez fondled filed a sexual assault report with the Scottsdale Police Department that same day.

37. As a result of the Scottsdale criminal complaint, the Arizona Department of Public Safety opened an internal investigation into Officer Sanchez. Mr. Rosenberger was notified of the investigation by DPS and told to have no communication with Officer Sanchez or SPD regarding the investigation.

38. On October 28, 2020, Scottsdale Police Investigations Commander Cioli communicated with his former colleague Rosenberger that the Sanchez report and Suspension Order both confirmed that Sanchez touched the dancer, and Cioli told Rosenberger that the report "does not look good." Rosenberger, ignoring DPS's admonition not to speak to Sanchez regarding the investigation, then instructed Sanchez to rewrite his already-approved report and his Suspension Order, which Sanchez did. Director Cocca was aware of these actions.

7

39.     The altering of the evidence became known. This led the Arizona Peace Officer Standards and Training Board (AZPOST) to bring charges against Cocca, Rosenberger, and Sanchez.  AZPOST also opened an investigation into Commander Cioli's actions.

40.     In December of 2020, Scottsdale Police Department Internal Affairs Division sustained findings against Cioli for policy violations relating to his off-channel communications with DLLC and his handling of the entertainer's complaint and related evidence. (Scottsdale did not pursue the dancer's complaint). In July 2021, Scottsdale Police Chief Walther drafted, and Cioli signed, a letter of counseling. This resolved Scottsdale's internal investigation, but not AZPOST's investigation.

41.     On April 14, 2021, Officer Sanchez resigned from DLLC in lieu of termination.

42.     On April 16, 2021, Director Cocca and Deputy Director Rosenberger both resigned from the DLLC in lieu of termination.

43.      On July 13, 2021, Cioli signed Chief Walther's letter of counseling for his involvement in changing evidence in the sexual assault report, which was found by Internal Affairs. Cioli remained in command over all Scottsdale investigations.

44.      Commander Cioli retired effective December 30, 2021, in lieu of discipline.

**Skin and Bones**

45.     It is a feature of the adult entertainment business that individuals frequently come into the clubs, get excited, forget themselves and run up extremely large bills.  In Scottsdale, especially during the season, January – April, many very wealthy individuals come into the clubs and spend extravagantly without complaint. Others spend extravagantly but are not so wealthy. Unfortunately, individuals, both the very wealthy and not so well-heeled, often regret their purchases and seek to avoid payment for the services they requested, usually by claiming credit card fraud.

46.     In response to this issue, adult clubs have had to resort to taking significant steps to confirm customers' purchases.  For individuals ordering private dances in the VIP rooms, the Plaintiffs required copies of the customer's driver's license and credit card, fingerprints, and signatures or initials on orders for services, and photographs of the individuals purchasing VIP dances with their bills.

47.     Often in the case of exceptionally large bills, the dancers were also advised to write a narrative of the night's events and the services purchased.

**Scottsdale Police Target Skin and Bones Cabarets**

48.     In September of 2021, several months after Commander Cioli was officially reprimanded by the SPD, SPD Commander Cioli still remained above Defendant Lewis and Detective Metz in the chain of command.

49.     On information and belief, facing discipline and forced retirement stemming from the sexual-assault matter at Skin Cabaret, Cioli harbored retaliatory animus toward Plaintiffs and used his remaining tenure and relationships within SPD to support and/or initiate a retaliatory campaign targeting Skin Cabaret and Bones Cabaret. The other defendants listed herein continued this targeted campaign even after he was gone.

50.     As part of the campaign against the Plaintiffs, Detective Metz was assigned to investigate all crimes in the geographic area containing the Skin and Bones cabarets.

51.     Metz has stated under oath that prior to this reassignment, he recalls receiving only a couple of reports of individuals claiming to have been overcharged at the Skin or Bones nightclubs. And those reports were handled as civil matters, which was consistent with Scottsdale Police Department policy to avoid "involvement in civil matters unless police presence is essential to preserve the peace."

52.     Yet, immediately upon assuming the new assignment, Officer Metz began re-opening past claims by individuals who alleged that their credit cards were overcharged for services at the Skin and Bones clubs and began what he referred to as a "pattern investigation."   But before there can be a pattern of crime, there must be at least one crime.

Metz had no evidence of a single crime being committed at the clubs. No one had been charged with a crime. Instead of investigating several crimes to see if they were related, Officer Metz began to create the evidence of a pattern of alleged criminal activity so that he could defame, damage and wrongly prosecute the Plaintiffs out of business.

53.    On or about September 2021, with the knowledge of and supervisory approval from Walther, LeDuc, Cioli, and Lewis, Metz began re-opening previously closed civil complaints, reclassifying them as criminal "fraud schemes and artifices" and aggregating them into a purported large-scale pattern investigation of the clubs with the intent of targeting and damaging the clubs.

54.    Internal Scottsdale Police Department email communications produced by Plaintiffs confirm that this investigation was coordinated among Metz, Lewis and other SPD detectives and supervisors and was known to SPD command staff, including Defendants Walther and LeDuc.

55.    As part of its efforts to close the Plaintiffs, the Scottsdale Police Department created an entire team to investigate the Plaintiffs that eventually included at least eight Scottsdale Police Officers.

56.    Scottsdale Police Departments' attack on the Plaintiffs clubs was multipronged. It consisted of attempting to de-bank the Plaintiffs and cut off their ability to access financial services; the supporting and encouraging the filing of civil claims against Plaintiffs, most of which the SPD knew or should have known were meritless; the defaming of and placing Plaintiffs in a false light so as to discourage patrons from attending the clubs; and more recently committing perjury in support of civil arbitration claims against American Express in an effort to have the charges for services reversed, ultimately to the harm of the Plaintiffs.

57.    On December 30, 2021, Officer Cioli resigned to avoid further AZPOST investigation, but Metz kept at his investigation.

10

58. The complaints Detective Metz was ostensibly investigating were claims by patrons that their credit cards had been overcharged for services while they were at the Defendant clubs. With perhaps an exception they were not claims of being drugged while at the clubs.

59. For example, Mr. Jonathan Chen went to the Skin Cabaret on October 29, 2021. The next day, he contacted the Scottsdale police department and admitted that he was very intoxicated when he went to Skin. He told the police he arrived at Skin at 11:00 pm and he estimated he stayed there until 5:00 am the next morning when he recalled that the staff ordered him an Uber to get home. He admitted that he could have made the charges, but he could not remember. The Scottsdale Police Department informed Mr. Chen that he was not alleging a crime, but he could call back once he got the charge records and had evidence of a crime. Mr. Chen never called back.

60. When he began his investigation, Detective Metz began going back to old police reports and contacting those, such as Chen, who had made claims against the Skin and Bones cabarets, which had been closed. Metz would then, without any new evidence, reopen the claims as criminal matters.

61. Tellingly, Metz at this time would list as suspects in his police reports Todd Borowsky, the ultimate owner of the clubs, even though no one had suggested he had any involvement in any of the overcharging claims.

62. Metz would often tell those who he called about their old overcharging complaints that he had fifty or more similar complaints from individuals claiming to have been drugged at the clubs. He would say this to individuals who, until then, had not claimed to be drugged.

63. This is what he did with Mr. Chen. Metz contacted Mr. Chen and appears to have convinced Mr. Chen that he might have been drugged at the clubs.

64. Similarly, on May 11, 2022, Metz cold-called the wife of Graham Campbell, whose prior complaint had been closed as a civil matter; Metz generated a new report

11

listing a felony fraudulent-schemes offense without adding new evidence, illustrating the pattern of reclassification for purposes of damaging Plaintiffs. Metz repeated and continued this pattern of opening or reclassifying police reports over the next three years.

65.    Detective Metz did not have, never had, nor does he now have any evidence that any patron at either club was drugged. In fact, he did not and does not have any evidence, other than their own self-serving statements, that any individual even had their credit cards improperly charged. Yet Metz, with support of the SPD command staff altered the police reports concerning the Plaintiffs. He selectively reported new claims presenting the evidence in a misleading manner and Metz omitted exculpatory information while emphasizing unsupported allegations.

### Scottsdale's Sham Investigation

66.    When Detective Metz reopened the claims, and when he investigated new claims, he did not perform a proper investigation because his goal was not justice but payback. For example, Metz never interviewed the entertainers, hostesses, and managers whose actions he was allegedly investigating.

67.    Scottsdale Police Department's Mission statement includes a directive to "Get the Facts – There's always more to the story than you think. Learn to ask questions and gather the facts before jumping to conclusions and making judgments. Be curious about additional information that might yield a more complete picture."

68.    Defendants Lewis, Walther, and LeDuc were aware Metz was ignoring the requirement to get the facts, ask questions and to be curious and they approved his actions. They took no action to stop Metz' unconstitutional attack on the Plaintiffs. They encouraged his actions.

69.    If Defendants did not intend to harm Plaintiffs' businesses, then Scottsdale either failed to have any procedures for investigating alleged financial crimes, failed to train Metz in how to perform an investigation, or it failed to supervise Detective Metz to ensure he conducted a proper investigation.

70. Defendants' failures of supervision included at a minimum allowing Metz to change police reports without new evidence, encouraging him to interfere with Plaintiffs' business relationships, permitting him to ignore the evidence that the charges were legitimate, not requiring that Metz interview those whose actions he was purportedly investigating, and failing to caution Metz regarding the reliability of the witnesses who were involved in civil litigation with the credit card companies and the Plaintiffs and therefore had a financial interest, and in many cases personal reasons, to fabricate or embellish their testimony.

71. If Detective Metz truly wished to investigate a claim that someone's credit card was improperly charged for services, he would necessarily seek to interview the individuals providing that service and making the charges. He did not. He did not seek to interview the alleged criminals even on new claims that were reported. Metz never sought to speak to the dancers who negotiated the pricing and provided the services. And these dancers are licensed by the City of Scottsdale. Metz knew how to contact them. Metz failed to interview the managers on duty at the time the transactions occurred, and he never asked to interview Mr. Borowsky.

72. Metz did not properly investigate the allegations because he already had or should have had the evidence that the charges were legitimate and, thus, he was just out to harm Plaintiffs.

73. On April 5, 2022, Metz took the highly unusual step of emailing all SPD detectives with the subject "Skin and Bones" announcing an in-person "strategy meeting" regarding Plaintiffs' clubs. This meeting was part of Defendants offensive against the Plaintiffs.

74. On April 7, 2022, then-Police Chief Jeff Walther emailed Assistant Chief of Police Joseph LeDuc with the subject line "Bones Cabaret," confirming that both the Chief and Assistant Chief knew of this unusual activity, were aware of the actions of Metz and condoned them.

13

75.    On May 5, 2022, Joel Lewis sent an email to Metz asking him "How is your schedule? I want to get everyone together reference the Skin/Bones and assign tasks, Joel." Again, Lewis was both aware of and had active involvement in the sham investigation of Plaintiffs' clubs.  The tasks he planned apparently did not include discussing any claim with those who allegedly overcharged a customer or reviewing the evidence that those claiming to have been overcharged actually requested the services, agreed to the charges, and authorized the charges.

76.    Walther and LeDuc have known about this retaliatory investigation since at least 2022, and despite knowing there was no legitimate basis for it, they did nothing to stop it and ratified Metz' actions.

77.    On April 19, 2022, SPD Detective Alcini emailed all sworn SPD officers, directing that any call for service at Skin Cabaret or Bones Cabaret must be documented with a report and assigned to Metz.  Plaintiffs' clubs were the only businesses in Scottsdale singled out for such routing, as they are the only lawfully licensed gentlemen's cabarets operating under the city's sexually oriented business laws.

78.    On May 5, 2022, Lewis emailed Metz and multiple detectives writing, "[a]s we progress in the cases of Skin and Bones, I need to make sure everyone is informed," and referenced detectives' "roles/assignments." SPD personnel discussed meeting with Plaintiffs' "owner/legal" but did not set up that meeting.  No one had reported any crime by Mr. Borowsky, yet Detective Metz unilaterally listed him as a suspect. Yet, despite Metz listing Todd Borowsky as the suspect in the reports, SPD never sought to interview him.

79.    The clubs shared a bookkeeper, Susan McNeil.  Over six months into his investigation, Metz finally decided to speak to her.  That occurred on May 16, 2022.  Metz' did not inform Ms. McNeil regarding the scope of his investigation. Thinking it was the usual inquiry related to a chargeback dispute, Ms. McNeil voluntarily spoke to him and provided information on how the clubs were run.  She spoke with the officer for 90 minutes. She explained the process by which the clubs documented high-dollar transactions,

including that they made copies of Metz's alleged victims' driver's licenses, credit cards, took photos of the patrons with their bills, and, in some cases, had the dancers write contemporary narratives concerning the expenses.

80.    McNeil also provided Metz with the names and contact information for the managers, hosts/hostesses, and entertainers involved in disputed transactions and offered access to ledgers and credit card dispute packets.

81.    In July 2022, Ms. McNeil emailed Metz some detailed receipts and contracts, which listed hostesses and entertainers by name, showed that customers signed contracts and authorized charges consistent with club policies, and contained the approvals of credit card companies.

82.    After being told of the exculpatory evidence and being notified that the credit card companies had already seen the evidence and dismissed the claimants' disputes through their chargeback process, Metz did not complete and clear one complaint.

83.    Metz spoke to one manager of the Plaintiffs, Mr. Christopher Sanford.  He spoke to him only once. The only reason he spoke to Mr. Sanford at all is that Mr. Sanford dropped into Ms. McNeil's office when Metz was interviewing her and Sanford offered to show Metz around Skin.

84.    Mr. Sanford was not the manager of either Skin or Bones during the time of any of the charging disputes that Detective Metz was investigating.  Detective Metz asked no specific questions regarding any particular claim.

85.    Mr. Sanford voluntarily gave Metz a tour of Skin and explained how the business operated.

86.    Detective Metz never asked to speak with any of the managers on duty at the time of the disputed purchases.

87.    Detective Metz never sought to speak to the dancers who were alleged to have drugged customers and overcharged customers' credit cards.

15

88.     At this point in 2022 and certainly by 2023, Metz understood or should have understood that no crime was committed at the Plaintiffs' clubs. He would have had the often-inconsistent statements from the customers seeking to avoid payment, their photographs with their bills and thumb prints, and copies of their drivers' licenses and credit cards.  In some cases, he should have had the written narratives from the dancers.  If Metz had performed a real investigation, he would have spoken to the dancers, hostesses, and managers on duty during the alleged overcharging. And if he had done a real investigation, Metz would in some cases, have a recording of the alleged victim speaking with his credit card company authorizing the charges. The evidence for many if not most of the those filing reports was overwhelming and one-sided. It just did not support the Defendants' goal of harming the Plaintiffs' clubs.

89.     On May 6, 2023 Metz, without any new evidence, changed police report #2205585 from a civil matter to an open criminal matter and changed it to reflect a charge of Fraud Schemes and Artifices.

90.     On September 19, 2023, Metz, without any new evidence, added conspiracy to the offenses in police report #2205585.

91.     On October 3, 2023, Metz, without any new evidence, changed the police report DR# 2004567, and added a claim for conspiracy.  He also added Todd Borowsky as a suspect in a criminal conspiracy offense, again without evidence.

92.     Scottsdale's vendetta continued in 2024.

93.     As part of his scheme to drive the Plaintiffs out of business, on April 8 and 16, 2024, Metz met with the State liquor department and asked if they could send agents into the clubs to see if there were any liquor violations. He had no reason to believe there were liquor violations occurring but was seeking any method of destroying the Plaintiffs' operations.  Metz reported that the liquor department agreed to send inspectors in, but if they did, the clubs received no complaints nor citations as a result.

16

94. On May 22, 2024, nearly three years after he began his "investigation," Detective Metz finally interviewed one former hostess who used to work at the Plaintiff Clubs. Metz sought her out because Susan McNeil had informed him the hostess left on bad terms and he was hoping she would say bad things about the clubs he could use against the clubs.

95. This former hostess, whose name has been redacted from police reports, voluntarily spoke to Detective Metz. During the interview, at the urging of a member of the Arizona Attorney General's office who was present, Metz read the hostess her Miranda rights. The former hostess voluntarily continued to answer Metz' questions. When Metz asked her if they were drugging the patrons at Plaintiffs' clubs, she told Metz she "could not understand why the customer said that they were drugged. She believed that the customer would need to physically speak with their banks to get their charges approved." Then Metz told her that some customers reported that the dancers manipulated their phones to approve the charges. She told Metz "she never witnessed that and believed that the dancer would need a pin to open the customers phones."

96. Metz' police report does not reflect he asked her any questions concerning the specific customers she interacted with as a hostess whose claims he was purportedly investigating.

97. Metz' reports and his sworn testimony in the civil case reflect that he is baffled by the amount spent by some individuals at the clubs and therefore presumes that a crime has taken place. But as the hostess explained to Metz, "customers come in, they go into the VIP room, and they get caught up in the moment." Metz recorded but ignored her explanation.

98. Metz was desperate for any evidence to support his witch hunt against the clubs, so he told the hostess that some customers use their face to open the phone and therefore the dancers could open it by placing it in front of their face. But she observed no such thing.

17

99. Metz next asked her if the dancers would prop up a customer so that a photograph could be taken. She told Metz she never witnessed that. In fact, the former hostess refuted every one of the excuses that Metz and attorney Galarza (explained below) had concocted to refute the evidence proving that the patrons ordered and received the services for which they were charged.

100. The former hostess further told Metz if a dancer had drugged a patron the manager of the club would have been upset and explaining that patrons began making these claims of being drugged following the release of the movie the "Hustlers" which depicted some dancers in New York drugging rich people they would meet at bars and then taking them to cabarets where they ran up large bills. (The true events the movie was based on lasted only a few victims before the conspiracy – which did not involve the club – unraveled). Again, all her answers refuted any claim of Plaintiffs' involvement in any wrongful acts.  And the testimony came from a disgruntled former employee.

101. Metz ignored her testimony.

102. Metz, Lewis, Leduc, and Walther either inexplicably failed to recognize the incongruence between the claims and the facts, or they ignored them because they were inconvenient and got in the way of their real goal, which was to destroy the Plaintiff clubs.

103. Despite claiming to investigate the Plaintiffs' clubs for years, along with access to the resources of the Scottsdale Police Department, Detective Metz was unable to find evidence to support one claim of wrongdoing against the dancers or the clubs. Not one.

104. There were no warrants issued to search for drugs.

105. There were no witnesses subpoenaed.

106. Defendants' failure to perform the most obvious and basic of investigations or review the overwhelming evidence readily available to them that refuted claims of criminal conduct cannot be due to extreme incompetence, but rather is evidence that the investigation was a sham.

18

107. Metz pattern of conduct demonstrates that the manipulation of the investigative reports was not accidental but instead represents a continuing practice tolerated within the department to damage the Plaintiffs and run them out of business.

**Metz's Financial Attack**

108. As described, Scottsdale and Metz's goal was not to investigate and then clear complaints.   It was to run Plaintiffs' clubs out of business.  Central to the targeting campaign, Metz used his position to disrupt, intimidate, and terminate Plaintiffs' longstanding relationships and financial contracts with American Express, banks, and other financial institutions.

109. Even before interviewing any of the alleged suspects (which he never did) Metz sought to debank the Plaintiffs.

110. Metz began by contacting all of Plaintiff's financial partners and seeking documents for an investigation into the Plaintiff club's operations and directly asking Plaintiffs' financial partners to cease doing business with Plaintiffs.

111. Later, without probable cause to believe a crime had been committed, or that the records sought would provide evidence of the crime Metz' claimed to be investigating, Metz had the Arizona Attorney issues subpoenas for all the records from Plaintiffs' financial institutions. He also wrongly expressed to those institutions that Plaintiffs engaged in a criminal enterprise and advised them to shut down Plaintiffs' accounts.

112. Metz's actions triggered a cascading effect of multiple terminations of Plaintiffs' merchant-processing and banking relationships, causing substantial loss of revenue.

113. Detective Metz took these actions with the goal of causing harm to the Plaintiffs.

114. Early in 2022, Metz asked American Express to cancel Plaintiffs ability to use its cards – even though he had performed no real investigation of the claims to that date.  He had not even interviewed any of the suspects allegedly overcharging patrons.

115.   On February 9, 2022, Worldpay card processing canceled the account of Plaintiff Freedom of Expressions without explanation after Metz' inquiries.

116.   On March 10, 2022, at the urging of Metz, American Express and TSYS canceled Plaintiffs merchant services accounts.

117.   On March 21, 2022, Electronic Merchant Services canceled the account of Wisnowski Inc. after Metz' inquiries.

118.   On Mar. 24, 2022, Electronic Merchant Services canceled the account for Freedom of Expression LLC after Metz' inquiries.

119.   Upon information and belief, the merchant service accounts were closed at Metz's urging and after he contacted these companies seeking information irrelevant to the crimes he allegedly was trying to investigate.

120.   On April 6, 2022, Joel Lewis asked Metz if they could find out "whether Todd Borowsky took out any PPP loans or any government assistance loans." This had nothing to do with the claims Metz was investigating, but everything to do with attempting to find anything that might allow them to run Plaintiffs out of business. It also confirms Lewis's involvement in the scheme to shut down Skin and Bones.

121.   On April 7, 2022, Metz emailed Joel Lewis and other SPD personnel and reported that he had spoken with American Express contact Tauni Camacho and asked her to cancel product services to the Plaintiff clubs. Metz also reported that he learned American Express had approximately $400,000.00 in funds pending release to the Plaintiff Clubs, and he referenced that he had "hold off" discussions with Ms. Camacho confirming his attempt to have American Express withhold funds from the clubs to put further economic pressure on the Plaintiffs.

122.   In response to Metz' request American Express held approximately $400,000 of Plaintiffs funds for approximately six months.

123.   According to Metz, Defendant Reed Watson also had discussions with American Express seeking to influence it to shut down Plaintiffs' access to its services.

124. In August and September of 2022, Metz had the Arizona Attorney General issue subpoenas for the bank accounts of the Plaintiffs. Metz had no probable cause to request these subpoenas. Metz' claimed to be investigating drugging allegations. The response from the banks was to terminate the accounts.

125. On December 14, 2022, in response to Metz's subpoena, Wells Fargo Bank canceled all the business accounts of Wisnowski Inc. (Skin Cabaret) and Freedom of Expression LLC (Bones Cabaret).

126. On August 8, 2023, in response to Metz's subpoena, Bank of America canceled all the business accounts of Plaintiff Wisnowski Inc.

127. On August 10, 2023, in response to Metz's subpoena, Bank of America canceled all the business accounts of Plaintiff Freedom of Expression, LLC.

128. On November 20, 2023, in response to the subpoena of Plaintiffs' records, EC Suite processing company canceled "Skin Products LLC" and "Bones Products LLC."

129. All of Metz's communications with Plaintiffs' financial service providers were made without notice to Plaintiffs. In fact, Plaintiffs had no idea of the SPD's actions and involvement in the cascading termination of Plaintiffs' financial relationships until after they filed public records requests in April of 2024 and in response received emails indicating Defendants' involvement.

130. Metz' actions were taken without judicial or due process, and were selective enforcement based on Defendants own goals, using official color of state law to do so, despite SPD's own recognition that similar complaints had historically (over twenty years) been treated as civil matters, that there was no proof of drugging or fraud traceable to Plaintiffs, and that, therefore, no criminal claims could be brought.

### Scottsdale Promotes and Encourages Civil Suit

131. On March 9, 2020, a Mr. Sabol filed a lawsuit against Bones Cabaret and Dream Palace, an adult cabaret located on a county island between Scottsdale and Tempe that has separate ownership than Bones. Mr. Sabol claimed he went to Bones where he was

"unwittingly administered drugs of one sort of another." After which Mr. Sabol claimed, he was transported to Dream Palace, where his credit cards were charged for services he did not approve due to "having been drugged, due to alcohol, or some combination of the two."

132. On April 10, 2020, that same law firm filed another suit against the Dream Palace, this time on behalf of a Mr. Drozdowitz. In that suit, Mr. Drozdowitz made the identical assertion that he had been "administered drugs or one sort or another while at Dream Palace" and that he was improperly charged for services "due to having been drugged, due to alcohol, or some combination of the two." In other words, both gentlemen had no evidence they were drugged, they may have been drunk, but it seemed to them it might have happened.

133. In early October 2021 Attorney Ron Galarza took over both cases from the prior attorney who became ill.

134. At some point a relationship developed between Metz and other SPD detectives and Galarza wherein Metz used his position as an SPD detective to help Galarza procure dozens of additional clients for "drugging" lawsuits against Plaintiffs, despite the absence of competent evidence that such was occurring. In this way, Metz was able to manufacture the pattern he was claiming to investigate.

135. Metz referred individuals he contacted about past complaints as well as new individuals that contacted him with claims of being overbilled to Attorney Ron Galarza, who would add them to Mr. Galarza's mushrooming civil actions against the Plaintiffs. By this time, the claimants nearly always changed to include a claim to have been drugged because, they now claimed, they could not remember anything that occurred after entering the clubs.

136. In February and March of 2023, Mr. Galarza filed additional identical suits against Plaintiffs adding five patrons who all now claimed to have been drugged and over-charged for services.

137.    In February and June of 2024, Mr. Galarza filed more identical suits against the Plaintiff clubs and Dream Palace scooping up additional plaintiffs, many of whom are believed to have been referred by Metz, seeking to avoid payment for the services they received.  In at least one case a patron who returned multiple nights claimed that each time he went to the clubs he was drugged.

138.    As mentioned, the reports that Metz reopened were not all full police reports. Many had been closed with no further action to be taken. Many, if not most of the reports, were not filed contemporaneously with the alleged acts complained of, but rather were filed months later, after the person making the report had exhausted their attempts to get their credit card companies to void or reduce their charges and often after they had retained counsel.  Some of the reports were filed at the request of their counsel, Mr. Galarza, who would frequently be on the phone with both his client and Detective Metz as the client made the police report. Metz treated each claim as valid.

139.    In this way, Galarza and Metz created a negative feedback loop generating, expanding, and reinforcing false claims of drugging patrons — all for the purpose of destroying Plaintiffs' businesses. And this negative feedback loop created the pattern that Metz was allegedly investigating.

140.    Metz failed to investigate any individual claim and either discover proof of a crime or clear it.

**Scottsdale Intentionally Defames and Places Plaintiffs in a False Light**

141.    On April 24, 2023, Metz emailed a claimant and client of Galarza, Patrick Mason, confirming, "I am currently closing out these cases," and acknowledged that SPD "does not have enough evidence to show that any criminal activity occurred on the part of the clubs."

142.    But Metz did not close his investigation and Defendants still hoped to run Plaintiffs out of business. Accordingly, despite having no evidence that would support continuing to investigate the Plaintiffs and his acknowledgement of his lack of evidence of

any criminal activity, Metz and the other Defendants sought opportunities to publicize the false claims of drugging and defrauding patrons.

143. On September 14, 2023, Joel Lewis emailed SPD officers Chris Blumling and Jeffrey Hawkins with the subject line reading "FYI Bones Fraud Story in the works." Lewis states in the email, "I do think the reporter's inquiry will help deter future crimes and reports from the businesses, Joel." Chris Blumling emailed back on September 18 and replied, "agreed."

144. SPD was knowingly seeking to label Plaintiffs publicly as criminal enterprises despite the fact that they had spent two years "investigating" the alleged crimes and found no evidence to support their theory that any crime had been committed.

145. On September 20, 2023, Joel Lewis in an email reported that "On Tuesday Aaron Bolin will be giving an interview to a TV reporter about the allegations." Aaron Bolin was the SPD Public Information Officer. Lewis was aware that SPD had no evidence a crime had been committed but approved the SPD's plan to place the Plaintiffs in a false light so as to harm them financially. This occurred after Metz sent his email admitting he had no evidence of a crime and was closing the case.

146. On September 27, 2023, Aaron Bolin emailed Joel Lewis Q & A questions and answers he drafted for reporter Justin Lam of Fox News. He also asked for an update on the matter, stating, "I am just emotionally invested in this case now and curious." Upon information and belief the only reason he was emotionally invested was because of the loss of his fellow officers as a result of the botched investigation. SPD has not produced those questions and answers but certainly nowhere in the questions and answers did Mr. Bolin state the truth — that SPD had spent two years investigating these complaints and found no evidence to support them. He should have told the reporter that the claims had no merit.

147. On March 25, 2024, Fox 10 News aired and republished Galarza's lawsuit allegations concerning drugging customers and defrauding credit cards, and repeated

SPD's "drugging/fraud" narrative about Skin Cabaret and Bones Cabaret. SPD spokesperson Aaron Bolin is quoted stating there is an "ongoing investigation."

148.    In fact, SPD had been performing its investigation for years and uncovered no evidence to support any criminal action. SPD's comments suggested that the false claims of being drugged had merit. And those comments were made with the purpose of placing Plaintiffs in a false light.

149.    On March 28, 2024 Plaintiff Todd Borowsky received a call from Rocky Pelone, a private investigator and former adult cabaret manager. Rocky informed Mr. Borowsky that Mr. Galarza had tried to hire him as an expert in the civil litigation suit and that Mr. Galarza had stated that he had "a couple of detectives down in Scottsdale. They're just referring people to me because these are open cases.".

150.    On April 10, 2024, Metz emailed Galarza with the subject line "Fox 10 report," writing, "Could you call me at your earliest convenience?" On information and belief, he wanted to discuss the FOX10 news report and their ongoing attack on the businesses.

151.    As a result of the Fox news story, Plaintiffs learned that Scottsdale had an "on going investigation" open against them. Prior to that time Plaintiffs had no contact with SPD or any Defendant since Metz spoke with Susan McNeil and Christopher Sanford in May of 2022.

152.    After hearing from Rocky, Plaintiffs learned that Scottsdale was referring individuals to Mr. Galarza so that they might sue Plaintiffs.

153.    After the news story and discussion with Rocky, Plaintiffs filed public records requests for documents regarding them and any on-going investigation from the Scottsdale Police Department. Once responses, limited as they were, were received, the nature of the attack on Plaintiffs was uncovered.

**The Sham Investigation Continues**

154.    Although he claimed to be conducting a legitimate investigation into claims of alleged crimes occurring at Plaintiffs' clubs, Metz, instead, simply set out to find anything he could to pin on the Plaintiffs. He did not seek out evidence that disproved his theories and then blatantly ignored such evidence when it was presented. Even after conceding a lack of evidence in 2023, after the television hit pieces, Metz reenergized his attack on the businesses.

155.    On April 8, 2024, Chief of Police Joseph Leduc emailed Sergeant Joel Lewis, Lieutenant Jeffrey Hawkins, and Commander Chris Blumling with the subject "Skin / Bones Case Update."  This email shows the chief of police and highest levels of SPD were aware of this ongoing investigation, were getting case updates, and yet failed to intervene to stop the ongoing damages while publicly labeling the businesses as criminal enterprises that were under investigation for drugging and defrauding customers.

156.    On April 9, 2024, Metz emailed SPD officer Chad Martin and stated, "for the past five years, Skin and Bones has been defrauding customers by possibly drugging or over serving them and maxing out their credit cards," adding that "There has been rumors online that they may be drugging customers." Metz also asks Chad Martin, "Do you still have access to the dark web? If you do is there a way to do a search for any information related to Skin and Bones Cabarets?"

157.    Metz had no evidence that Plaintiffs were drugging nor defrauding anyone. In fact, the evidence he had proved the opposite, and he never sought evidence from any of the alleged perpetrators of the crimes he fantasized were being committed.

158.    On April 9, 2024, Metz emailed Defendant Lewis and wrote, "we are looking for any information that we can use to single out dancers, managers, etc., then use that as leverage to get them to talk about the credit card fraud they are conducting."

159.    Here, Metz admits to seeking to coerce the dancers to perjure themselves into asserting crimes occurred to avoid punishment rather than to seek the truth. In an attempt

to manufacture such evidence, Metz found out one of the dancers had an outstanding warrant. Rather than simply pick her up at a convenient and safe time, SPD waited until she was leaving the club and pulled her over. Metz allegedly interrogated this dancer, whose identity is unknown, a transcript of her testimony is unavailable, but she obviously neither confessed to any crime or provided any evidence any crimes were being committed.

160.    On April 10, 2024, Metz sent the Fox 10 story to Arizona Attorney General agent Heidi Chance with the subject "Fox 10 follow up."  He did this hoping that the AG would assist them in this ongoing scheme to destroy Plaintiff and his businesses. Lewis circulated the story internally as well, with celebratory headings such as "news story on investigation," reflecting that the media campaign was part of their enforcement strategy to destroy Plaintiffs. All this occurred while no criminal charges were being brought and after three years the evidence proved the opposite of the narrative the SPD was promoting. And this intentional damaging of the Plaintiff businesses was done without providing the Plaintiffs with any opportunity to clear their names.

161.    Also on April 10, 2024, Metz emailed AZAG investigator Heidi Chance stating, "I'm going to reach out to Rod Galarza. He knows Justin Lum of Fox 10," underscoring the interlocking relationship between SPD, Galarza, and the media and the sole illicit and unlawful purpose of harming Plaintiffs.

162.    On April 15, 2024, Metz emailed Galarza with the subject line "Manager Info," writing, "Could you contact me at your earliest convenience."

163.    Galarza emailed Metz back that same day writing, "Confirmed [that] Nick Knudsen [is] willing to talk to you,". Nick Knudsen was one of Galarza's clients suing Plaintiffs.  Galarza and Metz are indicating continued coordination regarding potential complainants or witnesses.

164.    On April 15, 2024, Metz also emailed Haleigh Farrelly at the Arizona Attorney General's Office ("AZAG"), writing, "I received a call from Rod Galarza with the Galarza Law Firm.  He is the attorney with approximately 20 victims to Skin and Bones.

He has multiple subjects that would be able to assist you in the case." This confirms that Metz was coordinating with Galarza to drum up criminal charges by the attorney general's office to put further pressure beyond mere publicity and civil suits on Plaintiffs' businesses. Metz noticeably failed to tell the Attorney General that he helped Galarza procure those plaintiffs.

165.    Eventually, the Attorney General's office refused to prosecute anyone, as it found the claims lacked evidence and there was no likelihood of a conviction.

**Metz Continues His Attack During Credit Card Arbitrations**

166.    Not content with the outcome of his so-called "investigation," Metz sought to assist Galarza's clients in their arbitration proceedings with their credit card companies.

167.    On May 30, 2024, Metz emailed Sergeant Lewis and wrote "Sarge, I received a call from Rod Galarza on May 30th. It was a conference call with an Englewood, Colorado based attorney, Dustin Prieve. Dustin is representing Kirk Rasmussen (DR 2311449) in an arbitration suit with Chase. Kirk is being represented by Rod in the civil suit against Bones. Dustin wanted to know if I would be permitted to do a Zoom call for his arbitration hearing to provide certification and foundation for Mr. Rasmussens case."

168.    Metz offered to do this despite knowing there was no foundation for Mr. Rassmussen's case.

169.    Metz similarly agreed and did appear at a number of American Express arbitrations. During these arbitrations, Metz admitted that he had no evidence that the Plaintiffs in this case, their managers or owners were involved in any criminal activity. But Metz perjured himself when asked why he failed to interview any of the alleged criminal perpetrators. In response Metz falsely claimed that he tried to speak to the suspects (dancers, hostesses, managers) but no one would talk to him. But Metz contacted no one he suspected of committing crimes. And the few individuals related to Plaintiffs that Metz did contact all spoke to him freely and at length – and provided him no evidence to support his criminal theory.

170. Metz also implied in those proceedings that the only reason he could not prove that patrons were being drugged was because no one would speak to him. Again, this claim is categorically false. It was made in his official capacity and ultimately made to harm the Plaintiffs.

171. Upon information and belief, Metz made these false statements in part to cover up his own incompetence (how else to explain not talking to any suspects?) and also to imply that Plaintiffs were guilty of an offense, he just could not prove it because no one was going to admit it.

172. Defendants' actions in this matter were all done with an evil mind.

173. Defendants' sham investigation was outrageous and at best grossly incompetent at worst an abuse of power for revenge.

174. As a result of Defendants' actions, Plaintiffs have suffered significant economic injury and were placed in a false light.

## COUNT I

### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT PROCEDURAL

### DUE PROCESS

### (Deprivation of Property and Liberty Interests Without Due Process)

175. Plaintiffs incorporate by reference the preceding paragraphs as though fully set forth herein.

176. Plaintiffs possess protected property interests in their merchant-processing contracts, bank accounts, funds held by financial institutions, and the goodwill and continued operation of their businesses.

177. Plaintiffs also possess liberty interests in pursuing their chosen occupations, operating their businesses free from arbitrary and retaliatory government interference, maintaining their good name in connection with those businesses, and being free from misuse of governmental power to destroy those interests without fair process.

178. Acting under color of state law, Metz, Watson and perhaps other SPD Defendants contacted AMEX, TSYS, Electronic Merchant Services, Wells Fargo, Bank of America, and other institutions to induce them to apply derogatory codes, terminate merchant accounts, and freeze or withhold hundreds of thousands of dollars owed to Plaintiffs—before conducting any meaningful investigation of Plaintiffs' staff or records and despite acknowledging the absence of sufficient criminal evidence.

179. Defendants' ex parte, one-sided communications omitted exculpatory contracts, records, and staff information, and were made with the knowledge that these institutions would rely on Metz's and Watson's law-enforcement status and allegations.

180. These actions effectively seized Plaintiffs' funds and crippled Plaintiffs' ability to conduct business without providing Plaintiffs with pre-deprivation notice or a meaningful opportunity to be heard. These deprivations continue to this day.

181. Any theoretical post-deprivation remedies were inadequate because the financial institutions acted in reliance on Defendants' hidden or one-sided communications, and Plaintiffs were never afforded a forum to confront or rebut those allegations. Less burdensome alternatives, including ordinary investigative procedures and judicial process, were readily available, if Defendants had any evidence that would provide them probable cause to believe a crime occurred, but they never had such evidence.

182. As a direct and proximate result, Plaintiffs have suffered deprivations of property and liberty interests without due process of law, including lost accounts, frozen funds, lost profits, loss of business opportunities, reputational injury, and other damages.

## COUNT II

### 42 U.S.C. § 1983 – FOURTH AMENDMENT UNREASONABLE SEIZURE

### (Interference with Funds, Accounts, and Merchant Relationships)

183. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

Docusign Envelope ID: 05B9605A-DA99-4C5E-B7CC-50437664A609

184.    Plaintiffs had possessory interests in their merchant-processing contracts, bank accounts, and the continued use of associated funds.

185.    By instructing or strongly urging financial institutions through back-channel communication and by publicly labeling the businesses as criminal enterprises, to apply "CANCEL DEROG" codes to the businesses, terminate Plaintiffs' accounts, and freeze Plaintiffs' funds, Defendants Metz, Watson, Lewis, and others caused substantial interference with Plaintiffs' possessory interests without warrants, probable cause, or judicial oversight.

186.    At Defendants' urging American Express held $400,000 of Plaintiffs' funds for six months causing significant financial strain to the businesses.

187.    At Defendants' urging EC Suites held approximately $70,000 of Plaintiffs funds for several months and World Pay held up the payment of approximately $303,000.

188.    These actions were carried out under color of law, based on unsupported or exaggerated "drugging/fraud" allegations that Defendants themselves knew lacked evidence. No exigent circumstances justified these ex parte efforts.

189.    Furthermore, Defendants subpoena of Plaintiffs' financial records was not based on probable cause to believe they contained any evidence of a crime.

190.    Defendants' conduct constituted unreasonable seizures in violation of the Fourth Amendment, actionable under 42 U.S.C. § 1983, and directly caused loss of use of funds, interruption of business operations, and consequential damages.

### COUNT III

### 42 U.S.C. § 1983 – CONSPIRACY TO CONSCIOUSLY DEPRIVE KNOWN CONSTITUTIONAL CIVIL RIGHTS

191.    Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

192. Defendants and their co-conspirators reached a meeting of the minds to deprive Plaintiffs of their constitutional rights, including rights under the First, Fourth, and Fourteenth Amendments, through the coordinated acts alleged herein.

193. Overt acts in furtherance of this conspiracy include, without limitation:

194. Coordinated SPD meetings and email chains to develop and implement a "Skin/Bones" strategy;

195. Metz's recruitment of civil plaintiffs for Galarza's lawsuits by re-opening and reclassifying prior closed civil complaints into open criminal complaints and referring individuals to Galarza;

196. Ex parte communications with financial institutions to cancel and freeze Plaintiffs' accounts;

197. Joint meetings and shared messaging with AZAG, Maricopa County Sheriff's Office ("MCSO"), DLLC, and attorney Rod Galarza; and

198. Drafting and circulating media talking points and feeding a "drugging/fraud" narrative that was broadcast on Fox 10 local and national news channels and other outlets.

199. Defendants acted with the purpose of depriving Plaintiffs of due process, equal protection, and equal privileges and immunities under the law and for the purpose of punishing them for protected activity, in violation of § 1983.

200. Plaintiffs' actions described herein were in conscious disregard and deliberate indifference to the known federal or constitutional rights of Plaintiffs.

201. As a direct and proximate result, Plaintiffs suffered the harms described above.

**C**OUNT **IV**

**42 U.S.C. § 1983 – MONELL LIABILITY**

**(POLICY, CUSTOM, AND FAILURE TO TRAIN)**

202. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

203. The constitutional violations described herein were caused by the policies, customs, or practices of the City of Scottsdale and by its deliberate indifference and failures in training and supervision. This is especially egregious given the recent internal affairs finding of improper evidence altering in the related Covid/sexual assault matter.

204. Such policies and customs include, without limitation:

a. Targeting and suppressing adult-entertainment businesses through selective enforcement and adverse publicity;

b. Reclassifying civil disputes as criminal schemes without new evidence;

c. Using police authority and subpoena power to influence banks and processors to terminate contracts with Plaintiffs without due process;

d. Coordinating with media, Attorney Rod Galarza and outside agencies to label the businesses ongoing criminal enterprises rather than objectively investigate; and

e. Failing to train and supervise detectives and supervisors on due-process obligations, exculpatory evidence, and limits on law-enforcement involvement in private financial relationships.

205. The City's Chiefs of Police and other supervisory officers were aware of and ratified the actions described above. They knew that the sham investigation violated virtually every rule governing investigations. They were aware of, approved and ratified the efforts to place Plaintiffs in a false light. They were aware of, approved and ratified Metz' coordination with Mr. Galarza despite the clear conflict of interest. They were aware of and ratified Metz' failure to interview any subject of his investigation. They were aware of, approved and encouraged Metz improper contacts with Plaintiffs' financial partners and his request for subpoenas without probably cause.

206. City policymakers ratified the unconstitutional acts of SPD personnel by continuing to support the Skin/Bones campaign, failing to discipline those responsible, and endorsing the investigation and public media strategy.

207. The City of Scottsdale is therefore liable under Monell for the constitutional violations alleged herein.

### COUNT V

### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT LIBERTY INTEREST ("STIGMA-PLUS") DEFAMATION PER SE

208. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

209. The Fourteenth Amendment protects Plaintiffs' liberty interests in their good name and reputation when defamatory statements made under the color of state law are coupled with, and directly cause, a material alteration of legal status or the deprivation of a tangible property or occupational interest (the "stigma-plus" doctrine).

210. Plaintiffs possess liberty interests in pursuing their chosen occupations, operating their lawfully licensed adult-entertainment businesses, and maintaining their good name in connection with those businesses, free from arbitrary, retaliatory, and knowingly false accusations of criminality by state actors.

211. Defendants—including, but not limited to, Metz, Lewis, and Bolin, made and/or caused to be made statements to third parties, including media outlets, financial institutions, other law-enforcement agencies, and the public, asserting or strongly implying that Plaintiffs' businesses and personnel drugged customers, engaged in systematic credit-card fraud, and operated as criminal enterprises.

212. These statements included, among other things:

a. Official SPD talking points and communications prepared or approved by Bolin and others and provided to Fox 10 describing Skin Cabaret and Bones Cabaret as the subject of an "ongoing investigation" for drugging and defrauding customers and portraying Plaintiffs as criminal operations;

b. SPD and Galarza's communications to Fox 10 and other reporters framing Plaintiffs' clubs as locations where customers were drugged and robbed through

34

fraudulent charges; and

        c.     Metz's and other SPD Defendants' communications to AMEX, TSYS, Electronic Merchant Services, Wells Fargo, Bank of America, and other institutions asserting or implying that Plaintiffs' businesses were engaged in criminal drugging and credit-card fraud, were under active criminal investigation, and that they should cease doing business with Plaintiffs.

213.    These statements were widely published to third parties through television broadcasts, online news publications, and direct emails and telephone calls with financial institutions.

214.    The foregoing statements were false and misleading when made. Defendants knew or recklessly disregarded that: (a) credit-card companies, including AMEX, had already reviewed and accepted Plaintiffs' documentation in chargeback disputes; (b) Plaintiffs had provided exculpatory VIP contracts, receipts, and staff information corroborating the legitimacy of the transactions; (c) SPD had not charged any Plaintiff or employee with drugging or fraud; and (d) the Arizona Attorney General's Office had declined prosecution for lack of evidence.

215.    Defendants made and disseminated these statements under the color of state law, with actual malice and/or reckless disregard for the truth, and with retaliatory animus toward Plaintiffs' protected expressive activities and their reporting of official misconduct.

216.    The defamatory statements did not merely cause reputational harm in isolation.  Rather, they were made in close temporal and causal connection with, and were used as a basis for, concrete deprivations of Plaintiffs' property and occupational interests, including but not limited to:

        a.     The application of "CANCEL DEROG" and other derogatory risk codes to Plaintiffs' merchant accounts;

        b.     The termination or severe restriction of Plaintiffs' merchant-processing and banking relationships by AMEX, TSYS, Electronic Merchant Services,

Wells Fargo, Bank of America, and others;

c. The freezing and withholding of funds owed to Plaintiffs;

d. The stigmatization of Plaintiffs' businesses as criminal enterprises in the eyes of regulators, financial institutions, and the public, thereby impairing Plaintiffs' ability to operate their clubs, obtain or maintain financial services, and attract customers; and

e. The long-term impairment of Plaintiffs' ability to pursue their chosen occupation in the adult-entertainment industry in Scottsdale and elsewhere.

217. The combination of (i) false, stigmatizing public accusations of serious criminal conduct and professional dishonesty by state actors, and (ii) the resulting concrete deprivations of property and occupational interests described above, without prior notice or any meaningful opportunity to be heard, constitutes a deprivation of Plaintiffs' Fourteenth Amendment liberty interests under the "stigma-plus" doctrine, actionable under 42 U.S.C. § 1983.

218. Defendants never provided Plaintiffs with a name-clearing hearing or any other adequate process to contest or rebut the stigmatizing allegations they used to induce banks and processors to terminate relationships and to publicly brand Plaintiffs as criminal enterprises. Any theoretical post-deprivation remedies were illusory or inadequate because the financial institutions and the public relied on Defendants' hidden or one-sided communications and official imprimatur.

219. Independently and in addition, the statements described above falsely imputed the commission of serious crimes—including drugging, theft, and fraud—and accused Plaintiffs of professional misconduct and dishonesty in their trade or business, thereby constituting defamation per se.

220. As to the stigma-plus defamation claim, Defendants' statements were published, false, made with at least negligence as to truth or falsity (and, as to public or limited-purpose public figures, with actual malice), and not privileged. Damages are

36

presumed for such defamation per se, and Plaintiffs have also suffered actual damages, including the loss and impairment of merchant-processing and banking relationships, loss of profits, loss of goodwill, and emotional distress.

221. The acts of the individual SPD Defendants described herein were undertaken with the knowledge, approval and ratification of Defendants Walther and LeDuc and the acts were taken within the course and scope of Defendants' employment with the City of Scottsdale.  Accordingly, the City of Scottsdale is liable under § 1983 for the "stigma-plus" constitutional deprivation to the extent it was caused by municipal policy, custom, practice, or ratification as alleged in Count VII, and is vicariously liable for the defamation of Todd Borowsky and his businesses to the extent permitted by law.

222. Defendants' conduct was malicious, willful, and in conscious disregard of Plaintiffs' constitutional and state-law rights, warranting an award of punitive damages against the individual Defendants to the full extent permitted by law.

223. As a direct and proximate result of Defendants' "stigma-plus" deprivation of liberty and their defamation per se, Plaintiffs have suffered and continue to suffer severe economic loss, reputational harm, loss of business opportunities, emotional distress, and other damages in an amount to be proven at trial.

**<u>COUNT VI</u>**

**FIRST AMENDMENT RETALIATION**

224. Plaintiffs incorporate by reference the foregoing allegations as though fully set forth herein.

225. The operation of adult-entertainment cabarets such as Skin Cabaret and Bones Cabaret constitutes expressive activity protected under the First Amendment to the United States Constitution.

226. Plaintiffs have engaged in lawful expressive activity through the operation of their businesses for many years in compliance with Arizona law and the regulatory framework governing sexually oriented businesses in Scottsdale.

227. Plaintiffs also engaged in protected activity by reporting and exposing misconduct involving law-enforcement personnel connected to the sexual-assault investigation described above.

228. In response to these protected activities, Defendants undertook a series of retaliatory actions designed to punish Plaintiffs and suppress their businesses.

229. These retaliatory actions included, but were not limited to:

a. reopening previously closed civil complaints as criminal investigations without new evidence;

b. creating a special investigative team targeting Plaintiffs;

c. contacting Plaintiffs' banks and merchant-processing companies to encourage termination of Plaintiffs' financial relationships;

d. coordinating with civil litigants and private counsel to generate additional claims against Plaintiffs;

e. publicly portraying Plaintiffs' businesses as criminal enterprises through communications with media outlets;

f. continuing investigations despite acknowledging the absence of evidence supporting criminal wrongdoing.

230. The actions of Defendants would chill a person of ordinary firmness from continuing to engage in protected expressive activity.

231. Defendants' retaliatory actions were substantially motivated by Plaintiffs' protected activity and by animus toward Plaintiffs and their businesses as a result of the termination of the officers caught changing the sexual assault police report evidence.

232. The retaliatory campaign was carried out under color of state law and with the knowledge, participation, and ratification of supervisory officials and command leadership within the Scottsdale Police Department.

233. As a direct and proximate result of Defendants' retaliation, Plaintiffs have suffered economic harm, loss of financial relationships, reputational injury, interference

with business operations, and deprivation of constitutional rights.

234.    Defendants are therefore liable to Plaintiffs under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all claims for relief.

**WHEREFORE**, Plaintiffs, Wisnowski, Inc., d/b/a Skin Cabaret; Freedom of Expression LLC, d/b/a Bones Cabaret; and Todd Borowsky, prays this Court will enter an order in their favor and against each of the Defendants, City of Scottsdale, Joseph Leduc, Jeff Walther, Bruce Cioli, Joel Lewis, Dennis Metz, Reed Watson and Aaron Bolin, as follows:

A.    Granting judgment in favor of Plaintiffs and against each of the Defendants on all counts.

B.    Granting Plaintiffs their damages in the amount to be proven at trial;

C.    Granting Plaintiffs exemplary damages.

D.    Awarding Plaintiffs their costs, including any expert fees, incurred herein pursuant to 42 USCS § 1988(c);

E.    Awarding Plaintiffs their reasonable attorneys' fees pursuant to 42 USCS §§ 1981 & 1988;

F.    Requiring Scottsdale to provide a letter to all Plaintiffs' financial institutions clearing the Plaintiffs' names and admitting that Scottsdale has no evidence any crimes were committed by Plaintiffs.

G.    For such other and further relief as the court deems appropriate under the circumstances.

. . .

. . .

. . .

39

Docusign Envelope ID: 05B9605A-DA99-4C5E-B7CC-50437664A609

**RESPECTFULLY SUBMITTED** on March 20, 2026.

**TULLY BAILEY LLP**

*/s/ Stephen W. Tully*
Stephen W. Tully, Esq.
5230 East Shea Blvd., Suite 230
Scottsdale, AZ 85254
*stully@tullybailey.com*

**WILENCHIK & BARTNESS, P.C.**

*/s/ Dennis I. Wilenchik*
Dennis I. Wilenchik, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com

*Attorneys for Plaintiffs*

40

**<u>VERIFICATION</u>**

I, Todd Borowsky, individually and on behalf of Wisnowsky, Inc., an Arizona corporation, d/b/a Skin Cabaret, Freedom of Expression LLC, an Arizona limited liability company, d/b/a Bones Cabaret declare as follows:

1.    We are the Plaintiffs in the above-entitled action.

2.    I have read the foregoing Complaint and know the contents thereof.

3.    The matters stated in the Complaint are true of my own knowledge, except as to those matters which are stated upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on: _____3/20/2026_____

Wisnowsky, Inc. d/b/a Skin Cabaret

DocuSigned by:
*Todd Borowsky*
6889AA4E783B4BB...
By: Todd Borowsky
Its: Owner

Freedom of Expression, LLC d/b/a Bones Cabaret

DocuSigned by:
*Todd Borowsky*
6889AA4E783B4BB...
By: Todd Borowsky
Its: Owner

DocuSigned by:
*Todd Borowsky*
6889AA4E783B4BB...
By:  Todd Borowsky, individually